521 A.2d 796

**Jeffrey  Wayne  MALCOLM**

v.

**STATE  of  Maryland.**

**No.  750,  Sept.  Term,  1986.**

Court  of  Special  Appeals  of  Maryland.

March  5,  1987.

Appeal from the Circuit Court for Montgomery County; Irma S. Raker, Judge.

Joseph A. Dugan, Jr. (Dugan & McGann, P.A., on the brief), College Park, for appellant.

Norman L. Smith, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County and I. Matthew Campbell, Asst.

State's Atty. for Montgomery County, on the brief, Rockville, for appellee.

Argued before MOYLAN, GARRITY and ROBERT M. BELL, JJ.

MOYLAN, Judge.

Except for a trivial contention dealing with sentencing, this appeal by Jeffrey Wayne Malcolm rises or falls with the admissibility of the physical evidence. He was convicted of possession of PCP with intent to distribute. The physical evidence was obtained in the course of a *Carroll* Doctrine search of a pickup truck registered to and driven by the appellant. The interesting question raised by this appeal is that of whether there is a single standard for assessing probable cause or two separate standards—one for probable cause in a warrant application and another, stricter standard for probable cause for warrantless activity. We hold there is but one.

Following the denial of his suppression motion before Judge Peter J. Messitte, in the Circuit Court for Montgomery County, the appellant was convicted by a Montgomery County jury, presided over by Judge Irma S. Raker, of possession with intent to distribute and related offenses. Upon this appeal, he raises essentially four contentions:

1) That he was unlawfully arrested and that all physical evidence should, therefore, be suppressed as the "fruit of the poisonous tree";

2) That whatever the test to be employed, the police failed to establish probable cause that the pickup truck contained evidence of crime;

3) That Judge Messitte erred in assessing probable cause by the looser "totality of circumstances" standard of *Illinois v. Gates* rather than by the more highly structured two-pronged test established by *Aguilar v. Texas* and *Spinelli v. United States;* and

4) That Judge Raker misinterpreted Article 27, 286(b)(2) in sentencing the appellant to twenty years without possibility of parole.

▮ We do not consider the merits of the appellant's first claim because the claim, even if true, is immaterial. The search of the pickup truck that produced the evidence was based exclusively upon the *Carroll* Doctrine. Whatever happens, good or bad, to the driver or other occupants of a vehicle is an extraneous consideration in assessing the validity of a *Carroll* Doctrine search. If the appellant believes that he was mistreated by way of illegal arrest or by way of excessive force, he may sue the police or seek appropriate redress in some appropriate forum. The merits of such a complaint, however, are utterly immaterial to the validity of a *Carroll* Doctrine vehicle search. Without meaning to appear unduly callous but to make the point as forcefully as we know how, it is *on the limited question of a Carroll Doctrine search* a matter of sublime indifference whether the police treated the vehicle driver with utmost courtesy or manhandled him unconscionably. It is, of course, a matter of concern in other regards, but on the narrow question of the *Carroll* Doctrine, it is extraneous. If the search in question were being justified as a search incident to lawful arrest, the propriety of the arrest would be not only material but critical. Under *Carroll* Doctrine analysis, by way of contrast, the question of arrest—good, bad, or nonexistent—is simply not one of the doctrinal elements.

The appellant's second contention is that even if he is stuck with the "totality of circumstances" approach of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), probable cause was not established, even under that looser standard, for the vehicle search in issue. The pickup truck was warrantlessly searched under the so-called "automobile exception" to the warrant requirement established by *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The *Carroll* Doctrine requires that there be 1) probable cause to believe that the vehicle

contains evidence of crime and 2) an exigency compelling an immediate search. There is in this case no question as to the exigency. Everything hinges upon the establishment of probable cause. Even before *Illinois v. Gates*, probable cause had been articulately described in *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949):

> "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

■ Assuming that the *Illinois v. Gates* standard is applicable to the warrantless determination of an officer (a point we will consider formally when we deal with the appellant's next contention), it is clear that the task of the officer "is simply to make a practical, common-sense decision whether, given all the circumstances ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." 462 U.S. at 238, 103 S.Ct. at 2332. Our duty, as a reviewing court, is "simply to ensure that the [officer] had a 'substantial basis for ... conclud[ing]' that probable cause existed." 462 U.S. at 238–239, 103 S.Ct. at 2332. By that standard, we hold that probable cause was established.

It was at about 10:30 a.m. on August 20, 1985, that the pickup truck was stopped in the general vicinity of Georgia Avenue in Montgomery County. The bulk of the probable cause had been gathered by police during the immediately preceding 18–to–24 hours. The appellant was arrested along with Ricky Lewis. Ricky Lewis had initially been the prime target of the investigation. Ricky Lewis was indicted along with the appellant but, on the day of their scheduled joint trial, failed to appear. A bench warrant was issued for his arrest; he has not yet been apprehended.

At some undetermined time before the evening of August 19, Officer Dennis R. Gibbons, of the Narcotics Section of

the Montgomery County Police Department, received information from an unnamed informant. The informant was from the criminal milieu and had never before given information to the police. The information relayed by the informant was that Ricky Lewis had gone to Tennessee to obtain chemicals for a "cook of PCP." The informant indicated that the chemicals from Tennessee had been obtained and that the PCP would be ready for street distribution sometime on August 20.

Although the informant did not know Lewis's precise street address, he knew that he lived in a red brick apartment on Dalmar Street. He stated further that Lewis was driving Lewis's girlfriend's car, that the girlfriend's name was Vicky, and that the car was a bright yellow Mustang with the door molding off the left front door.

Officer Gibbons proceeded to Dalmar Street to verify what he could. He located a yellow Mustang with the molding off the left front door. It was parked in front of 32 Dalmar Street, which turned out to be the address of Ricky Lewis. The yellow Mustang, moreover, was listed to a *Victoria* Whitman. That corroboration, albeit of noncriminal detail, was quantitatively and qualitatively comparable to that found adequate by the Supreme Court in *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), a case that also involved a warrantless search and seizure.

A persuasive clue, by way of corroborating the tip that Ricky Lewis was involved in preparing PCP, was the cast of characters and their shady histories. Thirty-two Dalmar Street was placed under surveillance. Three individuals were observed leaving that address together. They were Ricky Lewis, Richard Manco, and the appellant. A local records check revealed an anonymous complaint that Ricky Lewis was manufacturing PCP. A subsequent check with the Maryland criminal history computer showed that Lewis had been convicted in Prince George's County on a felony charge involving PCP. There was also a local file on

Richard Manco, containing prior complaints regarding the distribution of PCP. Once the identity of the appellant was discovered, a computer check on him revealed a prior history of PCP manufacturing in Howard and Prince George's Counties. When three underworld characters, with criminal histories of PCP manufacture and PCP distribution, come together, the tip that PCP activity is afoot takes on credibility.

■ Ricky Lewis was carrying a medium-sized, blue vinyl suitcase. That is completely innocuous standing alone. It is also, however, compatible with the delivery of chemicals from Tennessee to prepare a batch of PCP. Richard Manco went to a Ford pickup truck and drove out of the story. Ricky Lewis followed the appellant to what turned out to be the appellant's tan and brown pickup truck. The two of them drove off. The pickup truck was registered to someone named Malcolm in McVal, Virginia. Jumping briefly ahead of the story, a subsequent check at the registration desk of the nearby Holiday Inn showed Room 600 listed to a Jeff Malcolm of McVal, Virginia. The registration of the vehicle, on the other hand, was to a Malcolm with a different first name. Though only a scintilla, it nonetheless bears noting that there is in the criminal milieu an elusive fluidity when it comes to naming patterns. In any event, Officer Gibbons followed the pickup truck for approximately seven blocks, until the pickup truck executed an unexpected U-turn. Rather than "burn" the surveillance, Officer Gibbons discontinued pursuit. Again, although of minor consequence standing alone, a possibly evasive driving maneuver takes on coloration in conjunction with other events. The sudden execution of a U-turn does not establish probable cause. It does mean more, however, when executed by a known underworld character with a history of narcotics involvement than when executed by a good citizen with no criminal record. On the street, if not at the trial table, an individual carries with him inextricably the burden of his reputation (not to mention the burden of the reputation of his passenger).

About 11 p.m. on August 19, Officer Gibbons, joined by Officer Mancuso, checked the parking lots of local motels for the appellant's pickup truck. They began with the motel parking lots closest to the home of Ricky Lewis. What they ultimately observed between 12:30 a.m. and 2:00 a.m. was a bizarre vehicular behavior by both the appellant and Ricky Lewis. That pattern, moreover, must be viewed in the time frame of the final countdown for the "cook" of the PCP that was to be ready for street distribution the following day. As the officers arrived at the Holiday Inn, they observed the appellant's pickup truck back into a parking space. The appellant and an unidentified person remained in the truck for approximately five minutes, possibly just conversing but possibly checking for surveillance. They then carried several grocery bags into the Holiday Inn. At about the same time, a separate surveillance observed Ricky Lewis just returning to his home on Dalmar Street. The officers were ready to "tuck in" both surveillances for the night when they became the recipients of a bit of unanticipated good luck. As the two officers were returning to Officer Gibbons's parked car, they observed the pickup truck, driven by the appellant, stopped for a red light at Route 355 and Montgomery Village Avenue. Directly behind the pickup truck was the yellow Mustang driven by Ricky Lewis. Both suspects were unexpectedly out on the road again within 30 minutes after having apparently retired to their respective residences for the night. As the officers continued to observe, the two suspect vehicles engaged in a counter-surveillance exercise that was out of the textbook. Initially, they both sat still in the travelled lane of the road through two red light cycles. Then after turning left onto Montgomery Avenue, the two vehicles made a U-turn and then several other turns before pulling onto a parking lot of a shopping center. Shortly thereafter, they both left that shopping center parking lot and, within a few blocks, pulled onto another shopping center parking lot. Faced with this goal-line defense of

"counter-surveillance," the officers discontinued their watch at 2:00 a.m.

One additional fact threw additional light on all of this activity. The report from the informant had been that Ricky Lewis was expecting a batch of chemicals *from Tennessee* in order to prepare the PCP for distribution. The records check on the appellant, who had appeared at Ricky Lewis's house in Maryland the day before the scheduled distribution, showed that *his last known residence was in Tennessee.*

The surveillance resumed at 9:30 the following morning at both the Holiday Inn and 32 Dalmar Street. The appellant left the Holiday Inn in his pickup truck and proceeded to 32 Dalmar Street. The appellant came out of 32 Dalmar Street, carrying a blue and white plastic cooler and placed it in the pickup truck. He then placed the blue vinyl suitcase, that had been observed the day before, against the cab of the truck. Ricky Lewis came out of the house and both men drove back to the Holiday Inn. Lewis remained in the truck while the appellant went inside the motel. The appellant came out a few minutes later carrying grocery bags, placed them in the truck, and drove off with Ricky Lewis.

While several officers followed the pickup truck, another went to the Holiday Inn. It was determined that the appellant had checked out. Whatever the mission had been that had brought the appellant to Montgomery County, it was apparently concluded. A check of his motel room showed it to be absolutely "clean." It was, therefore, eliminated as a possible repository for the suspected contraband, tightening the focus on the pickup truck. After following the pickup truck for approximately 30 minutes, the officers stopped it and executed the *Carroll* Doctrine search. In the course of opening the back of the truck, they detected a strong chemical odor. In the course of the search, they found the blue vinyl suitcase, opened it, and discovered large plastic bags containing parsley treated with PCP.

Looking at the totality of the circumstances, we do not hesitate to hold that the officers were not unreasonable in concluding that there was probable cause to believe that evidence relating to PCP would be found in the appellant's truck. If on the basis of this information the officers had done nothing, they would have been derelict in their duty. The appellant insists doggedly that each of the observations was innocuous. With the possible exception of the constellation of shady characters with their drug-related backgrounds, each observation, standing alone, may well have been innocuous. That, of course, is beside the point. That each fragment of a mosaic, viewed alone, is meaningless by no means implies that the mosaic itself is without meaning. This is one of those instances where the whole is, indeed, greater than the sum of its parts.

■ On this subject of probable cause, the appellant, of course, makes an additional claim. He urges that the looser "totality of circumstances" approach of *Illinois v. Gates* is applicable only to the assessment of probable cause in a warrant application and that the more highly structured, "two-pronged test" of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), remains the appropriate framework of analysis for assessing probable cause in a warrantless context. The appellant complains specifically that Judge Messitte failed to consider whether the informant in this case satisfied the so-called "veracity prong" of *Aguilar-Spinelli*. Our response to the contention is that the Supreme Court in *Illinois v. Gates* replaced the *Aguilar-Spinelli* analysis with the "totality of circumstances" analysis across the board, for all occasions when probable cause must be assessed.

There is, to be sure, a surface plausibility to the appellant's argument. The majority opinion of Justice Rehnquist gave a number of reasons for abandoning the rigidity of the *Aguilar-Spinelli* test. One of those reasons was that the *Aguilar-Spinelli* test, applied to the review of search war-

rants, would discourage the police from seeking warrants. The heart of this particular argument is found at 462 U.S. 236, 103 S.Ct. at 2331:

"If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search.... Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more."

The clear message of this passage is that warrants, lest we discourage their use, should not be subjected to a more rigorous probable cause test than warrantless police activity. It by no means states, nor even implies, that warrants should be subjected to a less rigorous standard for reviewing probable cause.

Indeed, a fair reading of the opinion strongly suggests that the Supreme Court never remotely contemplated that any courts were even applying the complex and highly structured *Aguilar-Spinelli* analysis to the warrantless probable cause determinations made by a policeman on the street.[1] The key sentence of that passage would make no sense if the more rigorous standard were being applied in both contexts. It is contrast, not similarity, that gives

---

1. We are unaware of any Supreme Court case that ever applied the *Aguilar-Spinelli* analysis in a warrantless context. The benchmark case in that context always has been, and remains, *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Even as *Illinois v. Gates* continued to look to *Draper v. United States* as a model, it acknowledged that the warrantless police activity in *Draper* might well not have passed the rigid scrutiny of *Aguilar-Spinelli,* "The tip in *Draper* might well not have survived the rigid application of the 'two-pronged test' that developed following *Spinelli."* 462 U.S. at 242 n. 12, 103 S.Ct. at 2334 n. 12.

meaning to the sentence, "If the affidavits ... are subjected to the [*Aguilar-Spinelli*] scrutiny ..., police might well resort to warrantless searches...." *Id.*[2] This self-evidence argument that courts should not discourage resort to the warrant process by subjecting that process to a more rigorous standard does not imply, let alone state, the opposite proposition that courts should subject the warrant process to a less rigorous standard of examination.

It is a truism that probable cause is probable cause is probable cause. The heart of the warrant requirement is that judges should make the probable cause determination whenever feasible and that the probable cause determination should be entrusted to the policeman only when exigency requires it. When there is an exigency requiring immediate action, however, the policeman is permitted to make the determination that ordinarily is entrusted to the judge. It is self-evidently the same determination, not a more rigorous one. The authority to make the determination has been shifted from one party to another; the nature of the determination itself, however, has not been altered. There was never any suggestion that there be two, rather than one, standards for assessing probable cause. The creation of two separate and distinct probable cause standards would represent a gratuitous and unnecessary complication of an already complicated aspect of constitutional law.

The apparent source for the appellant's idea is a single sentence from *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), quoted in an *Illinois v. Gates* footnote, 462 U.S. at 237 n. 10, 103 S.Ct. 2331 n. 10, which states, "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."

---

**2.** Why would the police resort to warrantless searches if they also were to be subjected to the same scrutiny the police were seeking to avoid?

That is a rule of construction indicating the "tilt" which courts should take in "doubtful or marginal cases" teetering so close to the brink that they could easily go either way. That is by no means a predicate for concluding that the Supreme Court has established two totally different frameworks of analysis for assessing probable cause in the two situations. The preference for the warrant is manifested by the establishment of a "tie breaker," not by the establishment of an entirely different ball game by an entirely different set of rules.

Indeed, except for this part of the opinion which argues that resort to warrants should not be *discouraged,* the larger thrust of the argument in favor of the practical, common-sense approach over the more rigid approach applies with equal force to probable cause determinations in both settings. If anything, the argument for the practical, common-sense approach is stronger when applied to a policeman on the street than when applied to a judge in chambers. The point we make, however, is that the Supreme Court opinion is not singling out one probable cause determination from another when it points out that the "totality-of-the-circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific 'tests' be satisfied by every informant's tip." 462 U.S. at 230–231. The observation that "the central teaching of our decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception,'" 462 U.S. at 231, applies with equal force to both settings. When *Illinois v. Gates, id.,* quoted with approval the statement from *Brinegar v. United States,* 338 U.S. at 176, 69 S.Ct. at 1311, "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," the point had even more bearing on the warrantless context than on the warrant context. If law-trained judges cannot be expected to be "legal technicians," police officers, *a fortiori,*

cannot. The observation from *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), quoted with approval at 462 U.S. 231–232, 103 S.Ct. 2328–29, applies especially to officers in the field:

"Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and *so are law enforcement officers.* Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by *those versed in the field of law enforcement."* (Emphasis supplied).

When the Supreme Court pointed out that "probable cause is a fluid concept ... not readily, or even usefully, reduced to a neat set of legal rules," 462 U.S. at 232, 103 S.Ct. at 2329, they were not suggesting that the concept was less fluid in the mind of the officer than in the mind of the judge. The Court then quoted with approval from *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972): "Informants' tips, like all other *clues and evidence coming to a policeman on the scene,* may vary greatly in their value and reliability." 462 U.S. at 232, 103 S.Ct. at 2329. (Emphasis supplied). *Adams v. Williams* was a case where a policeman acted warrantlessly on the basis of a tip from an informant, whose veracity had not been established. The *Illinois v. Gates* Court concluded its discussion of the *Adams v. Williams* precedent with its own observation that "Rigid legal rules are ill-suited to an area of such diversity." *Id.* The import here is clearly that officers in the field are not expected to apply "rigid legal rules."

Each of the arguments made by the Supreme Court applies to the assessment of probable cause generally, not just in the warrant-issuing situation. The Court pointed out the inappropriateness of the "two-pronged test" which "directs analysis into two largely independent channels":

"There are persuasive arguments against according these two elements such independent status. Instead, they are

better understood as relevant considerations in the totali-ty-of-the-circumstances analysis that traditionally has guided probable-cause determinations...."

462 U.S. at 233, 103 S.Ct. at 2329. That argument has force wherever probable cause is being assessed.

The most damning indictment of the *Aguilar-Spinelli* exegesis was that it was complicated beyond the point of diminishing returns: "That such a labyrinthine body of judicial refinement bears any relationship to familiar defini-tions of probable cause is hard to imagine." 462 U.S. at 240–241, 103 S.Ct. at 2333. If a judge cannot be expected to negotiate the labyrinth without getting hopelessly lost, *a fortiori*, the officer cannot. The Court was speaking gener-ally when it repudiated "an excessively technical dissection of informants' tips." 462 U.S. at 234, 103 S.Ct. at 2330.

The argument against subjecting officers who draft affi-davits and judges who issue warrants to formal rules appro-priate only to the courtroom applies with equal, if not greater, force to subjecting officers in the field to such courtroom standards.

"We also have recognized that affidavits 'are normally drafted by nonlawyers in the midst and haste of a crimi-nal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.'"

462 U.S. at 235, 103 S.Ct. at 2330. *A fortiori*, the "elabo-rate specificity once exacted under common law pleadings," cannot be imposed upon the split-second determinations made on the street "in the midst and haste of a criminal investigation."

"Likewise, search and arrest warrants long have been issued by persons who are neither lawyers nor judges, and who certainly do not remain abreast of each judicial refinement of the nature of 'probable cause.'"

*Id.* If the officials who issue warrants are not required to "remain abreast of each judicial refinement of the nature of probable cause," officers on the street are not:

"The rigorous inquiry into the *Spinelli* prongs and the complex superstructure of evidentiary and analytical rules that some have seen implicit in our *Spinelli* decision, cannot be reconciled with the fact that many warrants are—quite properly . . .—issued on the basis of nontechnical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." (Citation omitted).

462 U.S. at 235–236, 103 S.Ct. at 2331. If warrant-issuing judges are permitted "a standard less demanding than those used in more formal legal proceedings," *a fortiori*, officers on the street will be allowed the less demanding standard:

"[G]iven the informal, often hurried context in which it must be applied, the 'built-in subtleties,' *Stanley v. State*, 19 Md.App. 507, 528, 313 A.2d 847, 860 (1974), of the 'two-pronged test' are particularly unlikely to assist magistrates in determining probable cause."

462 U.S. at 236, 103 S.Ct. at 2331. If the "built-in subtleties" are "unlikely to assist magistrates in determining probable cause," *a fortiori*, they would cripple officers on the street. The wipe-out of *Aguilar-Spinelli* was with a broad brush. The appellant's argument to the contrary is untenable.

Indeed, *Illinois v. Gates* cast serious doubt on whether the *Aguilar-Spinelli* test should ever have been applied, even in its heyday, in the highly structured fashion that the appellant here urges, notwithstanding the fact that Maryland and many other states had applied it in that highly structured fashion. The Supreme Court pointed out, at 462 U.S. 230 n. 6, 103 S.Ct. at 2328 n. 6:

"As our language indicates, we intended neither a rigid compartmentalization of the inquiries into an informant's 'veracity,' 'reliability' and 'basis of knowledge,' nor that these inquiries be elaborate exegeses of an informant's tip."

. The Supreme Court's final condemnation of the *Aguilar-Spinelli* test, a condemnation that would apply to the warrant and warrantless contexts as well, was that it would, by inhibiting the use of informants, make law enforcement less efficient. Reflecting the present Supreme Court's strongly affirmative attitude toward the crime control model, *Illinois v. Gates* left no doubt as to its "tilt":

"Finally, the direction taken by decisions following *Spinelli* poorly serves '[t]he most basic function of any government': 'to provide for the security of the individual and of his property.' ... The strictures that inevitably accompany the 'two-pronged test' cannot avoid seriously impeding the task of law enforcement." (Citation omitted).

462 U.S. at 237, 103 S.Ct. at 2331–32. The Supreme Court went on to point out that if the *Aguilar-Spinelli* test were to be "rigorously applied in every case, [then] anonymous tips would be of greatly diminished value in police work." *Id.* The Court concluded that part of its discussion by highlighting the value to law enforcement that such tips afford, "[A]nonymous tips seldom could survive a rigorous application of either of the *Spinelli* prongs. Yet, such tips, particularly when supplemented by independent police investigation, frequently contribute to the solution of otherwise 'perfect crimes.'" 462 U.S. at 237–238, 103 S.Ct. at 2332.

The final abandonment of the *Aguilar-Spinelli* test was sweeping in its terms and not confined to the case of search warrants alone:

"For all these reasons, we conclude that it is wiser to abandon the 'two-pronged test' established by our decisions in *Aguilar* and *Spinelli*. In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations."

462 U.S. at 238, 103 S.Ct. at 2332. When a year later the Supreme Judicial Court of Massachusetts attempted to breathe some life back into *Aguilar-Spinelli*, it was sum-

marily reversed by *Massachusetts v. Upton,* 466 U.S. 727, 732, 104 S.Ct. 2085, 2087, 80 L.Ed.2d 721, 726 (1984):

"We think that the Supreme Judicial Court of Massachusetts misunderstood our decision in *Gates.* We did not merely refine or qualify the 'two-pronged test.' We rejected it as hypertechnical and divorced from 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' "

Our review of the decisions of the United States Courts of Appeals on the post-*Gates* review of probable cause in cases of warrantless searches and seizures reveals that all of the circuits that have considered the question are applying the *Illinois v. Gates* "totality of circumstances" approach to the warrantless context. *United States v. Mendoza,* 722 F.2d 96, 100 n. 5 (5th Cir.1983) ("We recognize that *Gates* dealt with probable cause for the issuance of a warrant for the search of a vehicle and a house. This determination of probable cause, however, is applicable to both warrant and warrantless searches."); *United States v. Marin,* 761 F.2d 426, 431 (7th Cir.1985) ("Although both *Gates* and *Upton* involved determinations of probable cause for the issuance of a warrant, '[t]his determination of probable cause ... is applicable to both warrant and warrantless searches.' "); *United States v. Reed,* 733 F.2d 492, 502 n. 4 (8th Cir.1984) ("Despite defendants' suggestion, there is no binding authority for the proposition that warrantless searches and arrests require a higher showing of probable cause than do those conducted with warrants."); *United States v. Smith,* 797 F.2d 836, 840 (10th Cir.1986) ("The 'probable cause' justifying a warrantless search is identical with that required to justify issuance of a search warrant").

The same returns are coming in from the academic community. The leading treatise on Fourth Amendment law is LaFave, *Search and Seizure* (2d ed. 1987). Professor LaFave recognizes that one of the reasons given for the *Illinois v. Gates* decision, the preference for warrants,

gives some plausibility to the type of argument made by the appellant here, but nonetheless goes on to conclude:

"[A] majority of the reasons given in *Gates*, assuming their validity, have equal force in the without-warrant setting as well. Because that is so and because of the apparent disinclination of courts to utilize the *Ventresca* principle on behalf of defendants in no-warrant situations, the chances are that *Gates* will receive unquestioned acceptance as a probable cause benchmark even when the police have acted without a warrant."

1 W. LaFave, *Search and Seizure* (2d ed. 1987) § 3.1(c), at 551.

The cases coming in from the states are tracking precisely the conclusions of the federal circuits and of the academic community. *State v. Espinosa-Gamez,* 139 Ariz. 415, 678 P.2d 1379, 1384 (1984) ("Under the totality of the circumstances test as set forth in *Gates, supra,* we believe there was sufficient evidence upon which the officer could have obtained a warrant, and that being the case, the warrantless stopping and searching of the automobile was proper."); *State v. Kimbro,* 197 Conn. 219, 496 A.2d 498, 501 (1985) ("While the *Gates* court reiterated the preference for search warrants, it seems fairly probable that the *Gates* test may be applied in fourth amendment cases to warrantless searches and seizures."); *Love v. State,* 254 Ga. 697, 334 S.E.2d 173 (1985); *People v. Tisler,* 103 Ill.2d 226, 469 N.E.2d 147 (1984); *Whisman v. Commonwealth,* 667 S.W.2d 394, 397 (Ky.Ct.App.1984) ("Although we do not have a search warrant situation in this instance, we feel the same rationale would be used for determining probable cause in a warrantless search."); *State v. Ruffin,* 448 So.2d 1274, 1278 (La.1984) ("Thus, a confidential informant may provide adequate information to establish probable cause for a warrantless arrest, so long as the basis for the information and the informant's reliability, when examined under the totality of the circumstances, are established. *Illinois v. Gates, supra;*"); *Eisenhauer v. State,* 678 S.W.2d 947, 952 (Tex.Crim.App.1984) ("It is clear that the

'totality of the circumstances' standard of *Gates* is applicable to warrantless arrests and searches."); *State v. Davis,* 35 Wash.App. 724, 669 P.2d 900, 902 n. 2 (1983) ("The new test established in *Gates,* therefore, is applicable when addressing either question."); *State v. Boggess,* 115 Wis.2d 443, 340 N.W.2d 516 (1983). The District of Columbia Court of Appeals is completely in line with the states. In *Jefferson v. United States,* 476 A.2d 685, 686 n. 1 (1984), Judge Kern reasoned, "The instant case involved a warrantless search rather than a search warrant. However, the same analysis to determine probable cause would be applicable here as it applies to the issuance of a search warrant."

The only state going in the opposite direction is New York. The appellant relies, almost exclusively, upon the New York decision of *People v. Johnson,* 66 N.Y.2d 398, 497 N.Y.S.2d 618, 488 N.E.2d 439 (1985). A close reading of that decision, however, reveals that it is totally inapposite. The New York decision to continue to subject warrantless probable cause determinations to the two-pronged test of *Aguilar-Spinelli* rests, in the last analysis, not on New York's interpretation of Fourth Amendment law but upon independent state grounds.

We hold that *Illinois v. Gates* clearly mandates that the "totality of the circumstances" approach, rather than the *Aguilar-Spinelli* approach, shall govern Fourth Amendment review of probable cause determinations in warrantless settings as well as in cases of search warrants.

■ The appellant's contention with respect to sentencing is utterly without merit. For anyone convicted of the felony of possessing PCP with intent to distribute, the court is free to impose any sentence up to the statutory maximum of twenty years and/or a fine of not more than $20,000. As part of its effort to curb recidivism, the Legislature established, through Article 27, § 286(b)(2), a minimum sentence of not less than ten years without eligibility for parole for any person "who has previously been convicted under this paragraph." With appropriate notice to everyone, Judge

Raker imposed the maximum sentence of twenty years, ten of it being without eligibility for parole. The appellant has concocted some indecipherable theory that the "minimum of ten years without eligibility for parole" somehow precludes any sentence greater than that. The establishment of a minimum sentence in no way impairs sentencing beyond that minimum so long as it remains within the maximal limits. We see nothing remotely improper in the sentence Judge Raker imposed.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.

ROBERT M. BELL, dissenting.

I dissent. I believe *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) applies only in the search warrant context and, further, that the information possessed by the police in this case did not constitute probable cause even under the totality-of-the-circumstances test enunciated in *Gates*.[1]

1. Applicability of *Gates* to Warrantless Searches

The majority holds that the totality-of-the-circumstances test applies equally to without warrant cases and with warrant cases. I find the rationale for this holding to be totally unpersuasive. The Court of Appeals of New York, presented with the identical question, reached the opposite result. The Court explained its reasons for doing so:

*Gates* involved a search warrant and the Court's reasoning relies heavily on the fact that the determination of probable cause was made by a detached and neutral magistrate. Thus, a large part of the Court's justification for adopting the new rule rests upon its view that, in assessing probable cause, the appellate courts prefer determinations made by a magistrate issuing a warrant over those based upon the "hurried judgment" of law

---

**1.** Finding it to be irrelevant, the majority does not address appellant's contention that he was arrested prior to the search and discovery of contraband.

enforcement officers engaged in investigating crime.... The importance of that consideration was emphasized by the language of the Supreme Court opinion which re-affirmed prior decisions stating that the use of warrants should be encouraged, by several statements that review-ing courts should accord great deference to the magis-trate's determination of probable cause ..., and by refer-ences to the protections afforded by limitations on a magistrate's power to approve a warrant.... Noting that warrant applications are commonly drafted by non-lawyers who should not be hobbled by technical rules ..., the court stated that applications are to be interpreted in a commonsense, not a hypertechnical manner. Finally the court noted that warrants were to be encouraged because the use of search warrants greatly reduces the perception of unlawful or intrusive police conduct by insuring the person whose property is being searched or seized of the lawful authority of the executing officer and the limits of his power....

These several arguments suggest that the Supreme Court may not apply the rule to situations involving warrantless arrests and searches and, as a matter of State constitu-tional law, we decline to so apply it. (citations omitted) *People v. Johnson,* 66 N.Y.2d 398, 497 N.Y.S.2d 618, 623–24, 488 N.E.2d 439 (1985).[2] *See* 1 W. LaFave, *Search and Seizure,* 2d ed. (1987), § 3.1(c), at 550–51. I agree with this analysis.

Neither the result reached in *Gates,* nor the analysis employed, can be divorced from the context in which the

---

**2.** I am aware, as the majority is so quick to point out, that almost all of the post *Gates* cases addressing the question have concluded that the totality-of-the-circumstances test applies to with-warrant and with-out-warrant searches alike; however, I am also aware that it is the quality, not the quantity, of precedent that is dispositive. *Johnson* is qualitatively better reasoned.

I am also aware that *Johnson* relied on State constitutional law. This does not in any way undermine the persuasiveness of its analysis or its conclusion that the Supreme Court may not apply the test to without-warrant cases.

case arose. Not only did the case involve a search warrant, but its rationale hinged largely, if not entirely, on that fact. Implicit in *Gates* is the recognition that different considerations obtain when a warrant permitting the search is issued prior to the search than when a search is conducted without a warrant. In the former, a detached, impartial magistrate makes a pre-intrusion probable cause determination; in the latter, the police make it. Where, therefore, the determination is made by a magistrate before the search is conducted, there is a significant interest to be served by deferring to that determination and by crediting, not condemning, after the fact, the action taken pursuant to it. *See e.g. United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). That interest, recognized in *Gates*, relates to the protection of individuals from unwarranted and unjustified police invasions of privacy and the desirability of "reduc[ing] the perception of unlawful intrusive police conduct." 462 U.S. at 236, 103 S.Ct. at 2331. Where, on the other hand, the decision is made by the police, with the result that the neutral and detached magisterial determination must be made after the fact—after the intrusion—deferral to that determination does not further that important interest. Moreover, because the police did not seek authorization in advance of acting, there is no justification for treating this action as if it had been so authorized. It was in this context that the Court re-evaluated the existing test for reviewing pre-intrusion probable cause determinations, and it was in this context that the Court fashioned the totality-of-the-circumstances test. It is understandable and natural, therefore, that the Court focused heavily on the warrant preference, deference to the magistrate's determination, and the perception of the legitimacy which police action pursuant to a warrant engenders.[3]

---

**3.** It is also significant that the Court requested briefing of and argument on the following question:

> [W]hether the rule requiring the exclusion at a criminal trial of evidence obtained in violation of the Fourth Amendment ... should to any extent be modified, so as, for example, not to require the

Before it was cited as one of the reasons for abandoning the two-prong test of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), it was well settled that the use of search warrants is preferred to warrantless searches and seizures. *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); 1 W. LaFave, *Search and Seizure,* 2d ed. (1987) § 3.1(c), at 548. As stated in *Ventresca,* "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Because the warrant preference was one of the reasons for adopting the totality-of-the-circumstances test and, given the context in which *Ventresca* was cited in *Gates,* it is safe to assume that the warrant preference retains its vitality even after *Gates.* The effect of the preference is "a subtle difference between the probable cause required when there is no warrant and that required when there is." *LaFave,* § 3.1(b), at 549. Thus, conceding that some of the reasons for abandoning the *Aguilar—Spinelli* two-prong test, may apply across the board—to with-warrant searches and without-warrant searches, it does not follow, as the majority would suggest, that the *Gates* test must necessarily apply to both situations. Nor is the majority's observation that "It is contrast, not similarity, that gives meaning to the sentence, 'If the affidavits ... are subjected to the [*Aguilar—Spinelli*] scrutiny ..., police might well resort to warrantless searches ...'," conclusive or even particularly persuasive. The converse of that observation is at least equally, if not more compelling—if the standard of review—and that is what we are talking about—were the same, there would be

inclusion of evidence obtained in the reasonable belief that the search and seizure at issue was consistent with the Fourth Amendment. (citation omitted)
462 U.S. at 217, 103 S.Ct. at 2321.

no incentive for the police to resort to the warrant at all. Without such incentive, the *Gates* rationale for abandoning *Aguilar—Spinelli* would amount to no more than empty rhetoric, a position which, I am sure, the majority would not support.

᠁ The majority in Steinian fashion [4] asserts that "Probable cause is probable cause is probable cause." They are, of course, correct. This does not mean, however, that probable cause determinations must, in all situations, be reviewed pursuant to ˙ only one standard. While there is only one concept of probable cause, as *Ventresca* teaches, the interests to be served may justify application of different standards of review. *See also Whiteley v. Warden of Wyoming Penitentiary,* 401 U.S. 560, 566, 91 S.Ct. 1031, 1044, 28 L.Ed.2d 306 (1971) ("the standards applicable to the factual basis supporting the officer's probable cause assessment at the time of the challenged arrest and search are at least as stringent as the standards applied with respect to the magistrate's assessment." [5]) Another fallacy in the majority's view is that probable cause in this case is so clear that a, to use the majority's term, "tie breaker" is not required. On the contrary, in my view, this is, in fact just the sort of case in which the warrant preference should be applied.

Having concluded that *Gates* applies only to with-warrant cases, I would apply the *Aguilar—Spinelli* analysis in this without-warrant case. That test would produce a clear result: probable cause to effect the search simply did not exist.

---

**4.** Gertrude Stein observed, in the poem, "Sacred Emily", that "Civilization began with a rose. A rose is a rose is a rose is a rose." *See The Third Rose, Gertrude Stein and her World* by John Malcolm Brinnen, Introduction, p. x; *Bartlett's Quotations.*

**5.** It is surprising that some of the without-warrant cases following *Gates* cite to *Whiteley* as support for doing so. See e.g. *United States v. George Reed,* 733 F.2d 492, 502 n. 4 (8th Cir.1984); *Wisman v. Com.,* 667 S.W.2d 394, 397 (Ky.App.1984).

## 2. Probable Cause under Totality-of-the-Circumstances

The totality-of-the-circumstances test replaced the *Aguilar—Spinelli* two-prong test [6] by mandating that

> ... The issuing magistrate ... simply ... make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place [, a]nd [that] ... a reviewing court ... simply ... ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Gates,* 462 U.S. at 238, 103 S.Ct. at 2332, quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960). The two prongs of the *Aguilar-Spinelli* test were reduced to "relevant considerations in the totality of the circumstances analysis", not to be analyzed separately. 462 U.S. at 233, 103 S.Ct. at 2329. Even under this test, however, sufficient information as to probable cause must be presented to the magistrate, whose determinations "cannot be a mere ratification of bare conclusions of others." 462 U.S. at 239, 103 S.Ct. at 2333. Thus, although the totality-of-the-circumstances test was intended to, and did, effect a substantial change in probable cause analysis from that espoused by *Aguilar-Spinelli, see Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), it does not require every probable cause determination by a magistrate to be adopted or affirmed by the reviewing court.

---

**6.** Under *Aguilar-Spinelli,* the magistrate had to be informed of "(1) some of the underlying circumstances from which the informant concluded that the incriminating evidence was located where it was claimed to be and (2) some of the underlying circumstances from which the affiant concluded that the informant, whose identity need not be disclosed, was 'credible' or his information 'reliable' ". *Potts v. State,* 300 Md. 567, 571, 479 A.2d 1335. *See Aguilar,* 378 U.S. at 114, 84 S.Ct. at 1514.

The tip in the instant case fails to pass muster even under the totality-of-the-circumstances. Assessed in light of the relevant considerations of veracity and basis of knowledge, it is clear that the tip contains no clue as to the reliability of the information or the tipster, or, for that matter, the basis of the tipster's knowledge. The detail provided, consisting only of the assertion that one Ricky Lewis had gone to Tennessee and obtained chemicals for a "cook of PCP", which would be ready for street distribution on August 20, that Lewis lived in a red brick apartment on Dalmar Street; that his girlfriend's name was Vicky; and that Lewis drove her car, a bright yellow Mustang with the door molding off the left front door, may not be considered self-verifying; it was just the sort of information that one may obtain from casual rumor or gossip. Moreover, the tipster's reliability had never previously been tested; he had given no information in the past, and he was from the criminal milieu. Thus, although independent police work confirmed that Lewis lived on Dalmar Street, and that he drove a car meeting the description given by the tipster and listed to a Victoria Whitten, and that he had previously been convicted of a felony charge involving PCP, unlike in *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) and in *Gates*, that information did not enhance the tipster's veracity or basis of knowledge.

Nor does the additional observations and information developed by the police, in combination with the tip, amount to probable cause. The observations and information included the following. Appellant and another man, neither of whom was mentioned in the tip, were seen in the company of Lewis. When observed, Lewis was in possession of a blue and white vinyl suitcase. Both appellant and the other man were later determined to have a prior history of PCP involvement, and it was learned that appellant had, at one time, lived in Tennessee.[7] Continuing their investigation,

---

7. The majority suggests that appellant's last known address was in Tennessee. The basis for this conclusion is unclear. The majority

the police learned that the pickup truck driven by appellant was listed to a person having a different first name than that used by appellant to register at his motel.

Important to the majority's conclusion that probable cause for the search existed are police observations of the driving patterns of appellant and Lewis. The first such observation occurred shortly after observing appellant for the first time. While being followed by the police, appellant made an abrupt U turn; Lewis was a passenger in appellant's pickup truck. The second occurred in the early morning hours of August 20, the day when the cook of PCP was scheduled to be ready for street distribution. At that time, the pickup truck, driven by appellant, and the Mustang, driven by Lewis, were observed to engage in what the police characterized as "counter-surveillance" driving.

Finally, later on the morning of the search in question, appellant was seen leaving his motel and traveling to Dalmar Street, where he picked up Lewis. Before leaving Dalmar Street, appellant put a blue and white plastic cooler in the truck and also was in possession of the blue and white vinyl suitcase, earlier seen in Lewis' possession. Appellant and Lewis returned to the motel and appellant checked out. His room having been searched and found to be "clean", the police followed the truck for about 30 minutes before stopping it and executing the search. Found in the blue and white vinyl suitcase were large plastic bags containing parsley treated with PCP.

From these circumstances, the majority concludes that there was probable cause for the search. It engages in a complex and intricate (one might even say tortured) analysis to reach the desired result: The blue and white vinyl suitcase, when first observed in Lewis' possession becomes

acknowledges that the motel at which appellant was staying showed appellant's address as McVal, Virginia.

a vehicle for transporting chemicals;[8] that appellant was registered as "Jeff Malcolm" and the truck he was driving was registered in the name of a Malcolm with a different first name takes on an "elusive fluidity", common to the criminal milieu; the U turn executed by appellant becomes "possibly evasive driving" and takes on a suspicious "coloration", because "executed by a known underworld character with a history of narcotics involvement"; the "bizarre" driving pattern is viewed in the time frame of when the "cook" is to be available for distribution; and the fact that appellant checked out of his motel room, accompanied by Lewis and with the blue and white vinyl suitcase in the truck, on the morning when the cook was to be ready for street distribution, becomes the link which ties all of the previous observations together.

I do not agree. I concede that the totality-of-the-circumstances justifies suspicion. It does not, however, justify a finding of probable cause. Contrary to the majority's contention, the corroboration of the non-criminal details supplied by the informant are not "quantitatively and qualitatively comparable to that found adequate by the Supreme Court in *Draper*...." *Draper* must be viewed in context. In *Draper*, there was no issue as to the veracity of the informant; the informant was a known quantity. Moreover, there was a greater nexus between the tip of criminal activity and the details which were verified—the observations were made at a train station, the terminal point of Draper's trip to acquire narcotics, 358 U.S. at 309, and the details were the kind that suggested personal knowledge or, at the least, inside information. In this case, there is absolutely nothing in the details given by the informant which would, independent of the veracity of the informant, suggest any violation of the law. And, consequently, verification of those details had no tendency to establish that the

---

**8.** This is most interesting. The informant said that the chemicals *had been* obtained from Tennessee; the informant did not provide, and the record does not reflect, any time frame to which his statement refers.

balance of the tip was accurate. Significant in this regard is the failure of the tipster to mention appellant as playing a role, either in delivery or distribution of the PCP, or to tell us when Lewis went to Tennessee or when he returned. The police investigation did not fill in the gaps.

Past criminal behavior may be a suspicious factor to be considered in the probable cause equation; however, it cannot, in and of itself, constitute the sole basis for a finding of probable cause. Birds of a feather do flock together. It is not surprising then that former convicts will have friends who are former convicts. The mere fact that they get together does not lead inexorably to the conclusion that a plot to engage in criminal conduct is afoot. One may be suspicious that this is so, but that is not enough to constitute probable cause.

Perhaps the most difficult aspect of this case is the "bizarre" driving pattern observed by the police on the morning of August 20, the very morning that the "cook" was to be ready for street distribution. Despite their conclusion that this was counter-surveillance driving and the obvious significance they attributed to that fact, no search was conducted at that time. On the other hand, when appellant was stopped and searched later that morning, after having been followed for some 30 minutes, no counter-surveillance driving or suspicious conduct of any kind had been observed. Assuming that the police were correct, that appellant and Lewis were engaging in counter-surveillance driving and that that fact, taken in conjunction with their previous observations and the information which they possessed would have given the police probable cause to conduct a search, it does not follow that probable cause existed later when no such conduct was witnessed. It is far more probable that the disposal of contraband would follow closely upon the suspicious conduct observed.

The bottom line is that all we have in this case are a series of police observations, coupled with an informant's tip and information gathered as a result of each, which

gives rise to a suspicion that Lewis and appellant are engaged in illicit activity. Neither the observations alone or in combination with the tip and the other information rise to the level of probable cause. If, as the majority suggests, probable cause exists in this case, then Mr. Justice White is right, the totality-of-the-circumstances test, being no more than a device by which reviewing courts are required to rubber stamp even the most implausible probable cause determinations made by a magistrate, represents "an evis-eration of the probable cause standard." *Gates,* 462 U.S. at 272, 103 S.Ct. at 2350 (White, J. Concurring). Not even *Gates* purports to require that result.