617 A.2d 619

STATE of Maryland

v.

Keith BLACKMAN.

No. 1144, Sept. Term, 1992.

Court of Special Appeals of Maryland.

Dec. 30, 1992.

286

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellant.

No brief or appearance by appellee's counsel.

**288**

Argued before WILNER, C.J., and MOYLAN and BISHOP, JJ.

MOYLAN, Judge.

The appellee, Keith Blackman, was charged by two criminal informations filed in the Circuit Court for Baltimore City with the crimes of 1) assault, 2) resisting arrest, 3) possession of cocaine with intent to distribute, 4) possession of cocaine, and 5) possession of cocaine with intent to distribute within 1,000 feet of an elementary school. The appellee moved pretrial to suppress the the physical evidence. Following a hearing on that suppression motion, the motion was granted. Pursuant to the provisions of Md. Code Ann., Cts. & Jud.Proc. § 12–302(c)(3) (1989), the State has taken this appeal.

For the reasons that follow, we reverse the ruling of the circuit court suppressing the evidence and remand the case to that court for trial.

We are dealing with a sequence of actions. A *Terry* -stop of the appellee, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), led to a *Terry* -frisk of the appellee. In resisting the frisk, the appellee shoved a police officer. That led to an arrest of the appellee for assault and battery. A search incident to that arrest revealed, in the appellee's coat pocket, the large bag of cocaine that was the subject of the suppression motion.

Like a World War II artilleryman, we are able to bracket the target of analysis to a single action in the middle of the sequence. It is agreed by all parties that the *Terry* -stop of the appellee was reasonable. At the far end of the sequence, it is agreed by all parties that if the shoving of the police officer was not privileged, the arrest for assault was reasonable and the search incident to that arrest was, in turn, reasonable. The single issue for decision is whether the appellee was privileged to shove the officer. As we bracket that target for further analysis, we will set the factual stage.

*The Terry–Stop*

At approximately 12:40 P.M. on March 2, 1992, Officers Keith Matthews and Donna Gutberlet of the Baltimore City Police Department were executing an arrest warrant on a burglary charge for Ulysses Thompson at 6220 Feroie Way. As the two officers entered the residence in an attempt to arrest Thompson, they encountered resistance from both Thompson and members of Thompson's family. Officer Matthews described the scene as "very chaotic."

In the midst of that turmoil, the appellee Blackman entered the house unannounced just as Officer Matthews was attempting to place handcuffs on Thompson. Officer Matthews had to direct Blackman to keep out of the way. Officer Gutberlet immediately advised her colleague that she recognized Blackman as someone who had been arrested for an attempted homicide in 1991. She recalled, moreover, that Blackman was the person who had actually done the shooting. Officer Matthews testified that he believed Blackman might be dangerous and that he was concerned for his own safety and that of Officer Gutberlet. He testified that, as he continued to struggle with Thompson, his primary concern was officer safety.

While Officers Matthews and Gutberlet were attempting to subdue Thompson, Officer James Stephens arrived as a "backup." Shortly thereafter, the police wagon arrived. Officer Stephens testified that, when he first heard the call for backup coming across the police radio, he could hear commotion in the background during the call. His primary concern as he responded to the scene was to determine whether any of the officers were in need of assistance.

As Officer Stephens arrived, he observed a British Sterling pull up in front of the Thompson house and observed Blackman exit the vehicle and enter the house. As Officer Stephens entered, he saw that Officers Matthews and Gutberlet were engaged in placing Thompson under arrest. He saw the appellee standing near the doorway. Officer Stephens recalled that he recognized the appellee "from being

in the neighborhood, I've known him as being a drug dealer." Officer Stephens had, moreover, been to the appellee's residence just a "couple of weeks prior" in an attempt to serve an arrest warrant on the appellee. On that earlier occasion, Officer Stephens had not been successful in his effort to locate the appellee and serve the warrant upon him. As he now spotted him near the doorway of the Thompson house, he did not know whether that arrest warrant had ever been served. It was established at the suppression hearing that the arrest warrant for the appellee had been issued on January 5 and was actually served upon him on February 10. The warrant was for battery and for carrying a deadly weapon.

In an effort to ascertain the status of the arrest warrant against the appellee, Officer Stephens detained him. He asked to see the appellee's driver's license so that he could run a warrant check over the police radio. He explained that to run a warrant check, the officer must supply the suspect's name, date of birth, and, when available, an address. Officer Stephens indicated that he regularly found a driver's license a better source of such information than the suspect himself, because "a lot of times people lie to you, and they don't give you their correct date of birth and that type of thing." Officer Stephens further testified that a warrant check typically takes between ten and twelve minutes.

█ The hearing judge found, and both parties agree, that this was a *Terry*-type stop, based upon the reasonable possibility that an arrest warrant might have been outstanding for the appellee. With respect to the Fourth Amendment reasonableness of that stop, the hearing judge ruled specifically:

"As to the stop, I believe under *Terry v. Ohio* and the *United States v. Hensley* case, Officer Stephens had reasonable suspicion to believe that a crime had been committed because of the fact that he had attempted to serve an arrest warrant several weeks before. And though this was not an arrest, I think that was certainly

enough to detain and to stop him while he momentarily did a warrant search, which was under 15 minutes. And it was closer, I think, to between 10 and 12 minutes, he said, that a warrant search would take to do.

So as far as the stop under *Terry v. Ohio,* the State conceded, and I agree, that a stop occurred. Another reason, I believe the State concedes, and the Court agrees, is that Officer Stephens candidly testified that the defendant was not free to leave the area until after he had done the warrant check because he wanted to know what—in fact, if that warrant was still there.

That's reasonable suspicion to believe that a crime has been committed in the past.

Therefore, this case is more like another 1991 Court of Special Appeals case, *Aguilar v. State,* 88 Md.App. 276, 594 A.2d 1167 (1991), an opinion by Judge Garrity. In the *Aguilar* case, the stop in that case was also conceded and, indeed, was found to be legal. And I have found the stop here to be legal. There is nothing about the stop to be illegal."

We believe that that conclusion was eminently correct.

### The Terry-Frisk or Attempt Thereat

It was while this stop of the appellee by Officer Stephens was in progress that the frisk, or attempted frisk, at the hands of Officer Matthews took place. While Officer Stephens was conducting the radio check on the status of the arrest warrant, Officer Matthews finally succeeded in arresting Thompson. Officer Matthews placed Thompson in the police wagon and then was free to turn his attention to the appellee. As he did so, Officer Stephens informed him that he "thought he had a warrant for [Blackman]." At that point, Officer Matthews approached Blackman and stated that he "was going to pat him down." Officer Matthews testified that he wanted "to make sure [Blackman] didn't have any guns or any weapons on him." He stated that in his mind "officer safety was first and paramount to me and the other officers there." He further

related that he believed he had "a person possibly wanted on a warrant who could have possibly been an armed felon." Blackman was wearing pants and a jacket.

As Officer Matthews was reaching out to begin the frisk, but before his hands had actually touched Blackman's person, Blackman shoved Officer Matthews' hand, pushed him back, and began to run. Blackman was caught a few feet away and arrested for assault and battery. The search incident to that arrest revealed a large bag of cocaine in his jacket pocket. In his suppression hearing testimony, the appellee candidly acknowledged that the reason he resisted the anticipated frisk was not because of any sense of offended dignity at being touched by the policeman but because he had drugs on his person.

## The Legality of the Arrest

If the appellee was privileged to use force against Officer Matthews in resisting the frisk, his subsequent arrest for such use of force was unlawful, the search incident to that unlawful arrest was unreasonable, and the cocaine was properly suppressed. If, on the other hand, the use of force against Officer Matthews was not so privileged, the arrest was lawful, the search incident to that lawful arrest was reasonable, and the cocaine should not have been suppressed. We hold that the appellee was not privileged to use force against Officer Matthews under either of two alternative rationales.

A. The Standard of Judicial Review at All Levels:

The first of those reasons is that the frisk was reasonable. As we examine its reasonableness, a preliminary consideration is called for as to the nature of judicial review. There is first the question of what standard of scrutiny we, on appellate review, should apply to the decision of the suppression hearing judge. There is then the question of what standard of review the suppression hearing judge should have applied to the determination made by the officer on the street.

■ To the extent to which the suppression hearing judge was called upon to make findings of first-level fact and to assess the credibility of Officer Matthews, and others, those are decisions that the suppression hearing judge is at a vantage point to make far more competently than we. Those are decisions, therefore, to which we, on appellate review, extend great deference and reverse only when they, as a matter of law, are clearly erroneous. No such problem is involved in this case.

■ Once credibility has been assessed and first-level findings of fact have been made, such as who did what to whom and when, a very different issue emerges. It is a mixed question of law and fact. The issue is that of what significance shall be given to the first-level facts as found. That is a question as to which all reviewing judicial tribunals—the suppression hearing court, the trial court, and the appellate court alike—are called upon to exercise an appellate-like discipline. At none of those levels of review will the court presume to decide, as if it were on the street, whether articulable suspicion existed. A reviewing court, at whatever level, will not second-guess that initial decision that had to be made and that then became the object of judicial scrutiny. By analogy to the review of probable cause determinations made by an officer on the street, we hold that the reviewing court, trial and appellate alike, must make the far more deferential determination of whether the officer had a substantial basis for concluding that articulable suspicion existed.

As we articulate the standard of judicial review in the context of stop-and-frisk scenarios, we are in a sense writing on a clean slate. In a larger sense, however, we are strongly influenced, if not controlled, by the compelling analogue of how the Supreme Court, the Court of Appeals, and earlier decisions of this Court have handled the not dissimilar responsibility of reviewing probable cause determinations. The analogy is an apt one. Probable cause determinations are frequently made by the officer on the street. Articulable suspicion or reasonable suspicion deter-

minations, either to stop or to frisk, are always made by the officer on the street. The exclusive and overarching constitutional concern is whether the officer, conducting either an intense search or a limited frisk, was acting reasonably. The reasonableness of the officer's conduct will always be assessed on the basis of the officer's training and experience and on the basis of circumstances as they reasonably appeared to the officer.

The probable-cause analogue by which we are here guided was a two-stage development. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), first made clear that probable cause determinations, in that case made by warrant-issuing magistrates, should not be subjected to *de novo* second-guessing by way of independent constitutional determinations of probable cause by reviewing courts. Reviewing courts were admonished to be deferential to those probable cause determinations and to affirm whenever there was a "substantial basis for ... conclud[ing] that probable cause existed." 462 U.S. at 238–239, 103 S.Ct. at 2332. In *Potts v. State*, 300 Md. 567, 479 A.2d 1335 (1984), the Court of Appeals, speaking through Chief Judge Murphy, explicitly adopted the Supreme Court's holding as to the appropriate standard of review. "After-the-fact judicial scrutiny of the affidavit should not take the form of *de novo* review." *Potts*, 300 Md. at 572, 479 A.2d 1335. *See also Birchead v. State*, 317 Md. 691, 701, 566 A.2d 488 (1989):

> "Our review of the judge's decision to issue the search warrants is limited to whether there was a substantial basis for concluding that the evidence sought would be discovered in the place described in the application for the warrant.... Moreover, we generally pay great deference to a magistrate's determination of probable cause. (Citations omitted)."

In *State v. Amerman*, 84 Md.App. 461, 581 A.2d 19 (1990), we applied this body of law and analyzed its logic. We pointed out that in certain circumstances a suppression hearing judge and/or a trial judge, no less than an appellate

court, sits in an appellate-like capacity where he is enjoined to extend deference to a decision made by another and to forego the luxury of making that decision for himself:

"The controlling principle dictating this reversal of a suppression order is that when a judge, either at a pretrial suppression hearing or at trial, sits in review of another judge's earlier determination that probable cause existed to issue a search and seizure warrant (or an arrest warrant), the reviewing judge sits in an appellate-like capacity with all of the attendant appellate constraints. Although he may ordinarily be accustomed to assessing probable cause as a matter of fact [as when he issues a warrant], he is in this less characteristic role called upon to assess it as a matter of law. The issue is no longer the familiar one of whether probable cause exists; that has already been determined by someone else. The distinct issue, at the reviewing level, is whether that earlier decision now being reviewed was or was not legally in error."

*Amerman,* 84 Md.App. at 463, 581 A.2d 19.

There is good reason for a reviewing court to refrain from presuming to make a *de novo* determination as to probable cause and, by analogy, as to articulable suspicion as well. There is along an ascending continuum no fixed, constant, or immutable point at which everyone must agree that probable cause (or articulable suspicion) suddenly springs into existence. There is, rather, a range within which rational determinations as to probable cause (or articulable suspicion) may be made. Rational decision-makers, moreover, may find probable cause (or articulable suspicion) at different points within that legitimate range. The ultimate question is not where some reviewing court may find probable cause (or articulable suspicion) to exist but whether the first decision-maker called upon to make that assessment did so reasonably. It was of this we spoke in *State v. Amerman,* 84 Md.App. at 463–464, 581 A.2d 19:

"Probable cause does not suddenly spring to life at some fixed point along the probability continuum. It may

arise at any number of points within a band of not insignificant width. Within that range of legitimate possibilities, the determination is as much an art form as a mathematical exercise and relies necessarily upon the eye of the beholder. One judge may give a circumstance great weight; another may give it slight weight; each is entitled to weigh for himself and neither will be legally wrong in so doing. Within proper limits, one judge may choose to draw a reasonable inference; another may as readily decline the inference; each will be correct and each is entitled, therefore, to the endorsement of a reviewing colleague. A permitted inference, after all, is not a compelled inference.

Under the circumstances, it is perfectly logical and not at all unexpected that a suppression hearing judge might say, 'I myself would not find probable cause from these circumstances; but that is immaterial. I cannot say that the warrant-issuing judge who did find probable cause from them lacked a substantial basis to do so; and that is material.' There is a Voltairean echo, 'I may disagree with what you decide but I will defend with my ruling your right to decide it.' " (footnotes omitted).

The second stage in the building of the probable-cause analogue which guides us in this case came with the decision of the Court of Appeals in *Malcolm v. State*, 314 Md. 221, 550 A.2d 670 (1988). In affirming the essential opinion of this Court, the Court of Appeals was called upon to determine whether the more permissive and deferential standard for reviewing probable cause determinations, which already was being applied when reviewing courts assessed the probable cause determinations of warrant-issuing magistrates, would also apply to the probable cause determinations made by officers on the street in order to conduct warrantless searches and seizures. After analyzing *Illinois v. Gates* itself, *Massachusetts v. Upton*, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), and numerous state and federal authorities, the Court of Appeals held

that the *Gates* standard applied to warrantless searches and seizures as well:

> "We hold that a totality of the circumstances test applies to warrantless searches and seizures, just as it currently applies to searches based on a warrant. *See Potts v. State*, 300 Md. 567, 479 A.2d 1335 (1984) (applying *Gates* test under state and federal constitutions for a search based on a warrant). Our review of the precedent of other jurisdictions supports this view." (footnote omitted).

*Malcolm*, 314 Md. at 230, 550 A.2d 670.

In our opinion in *Malcolm v. State*, 70 Md.App. 426, 521 A.2d 796, *aff'd and sentence vacated on other grounds*, 314 Md. 221, 550 A.2d 670 (1988), we elaborated more fully on what the *illinois v. Gates* standard looked for as it assessed the reasonableness of a policeman's probable cause decision. We observed:

> "Assuming that the *Illinois v. Gates* standard is applicable to the warrantless determination of an officer (a point we will consider formally when we deal with the appellant's next contention), it is clear that the task of the officer 'is simply to make a practical, common-sense decision whether, given all the circumstances ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.' 462 U.S. at 238, 103 S.Ct. at 2332. *Our duty, as a reviewing court, is 'simply to ensure that the [officer] had a "substantial basis for ... conclud[ing]" that probable cause existed.'* 462 U.S. at 238–239, 103 S.Ct. at 2332." (emphasis supplied).

*Malcolm*, 70 Md.App. at 430, 521 A.2d 796.

Our review was focused upon the decisional process of the policeman. Did the officer have a "substantial basis for conclud[ing]" as he did? Was the officer's decision reasonable? In anticipating the Court of Appeals' extension of the *Gates* standard of review from the warrant context to the warrantless context as well, we reasoned:

"If anything, the argument for the practical, common-sense approach is stronger when applied to a policeman on the street than when applied to a judge in chambers.... The observation that 'the central teaching of our decisions bearing on the probable-cause standard is that it is a "practical, nontechnical conception," ' applies with equal force to both settings. When *Illinois v. Gates* quoted with approval the statement from *Brinegar v. United States*, [338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) ], 'In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act,' the point had even more bearing on the warrantless context than on the warrant context." (citations omitted).

*Malcolm,* 70 Md.App. at 438, 521 A.2d 796.

■■ By parity of reasoning, we see no principled basis for applying a different standard of review to a policeman's on-the-street decision that articulable suspicion exists to conduct a stop or a frisk than we are now applying to a policeman's on-the-street decision that probable cause exists to conduct a warrantless search or seizure. Each decision is to be assessed by its reasonableness under the circumstances: did the officer have a substantial basis for concluding as he did?

The ultimate question before us, therefore, is not whether we or the suppression hearing judge, had we been present at 6220 Feroie Way at 12:40 P.M. on March 2, 1992, might under those conditions have feared that Keith Blackman had a gun. The question is whether Officer Keith Matthews's fear that Blackman had a gun was reasonable. If that fear was reasonable, if there was some substantial basis for it, the Fourth Amendment was not offended.

B. Who Must Entertain the Reasonable Suspicion?

■■ As we assess the reasonableness of the fear that the appellee might be armed, we note that it was Officer

Matthews, not Officer Stephens, who attempted to execute the frisk. We note that it was Officer Matthews, not Officer Stephens, who articulated reasons for believing that a frisk for weapons was necessary. It is only those facts known to the articulating officer that may be included in the articulable suspicion computation. Thus, we will eschew reliance on Officer Stephens' knowledge that the appellee was a drug dealer and the virtually "automatic" right to frisk for weapons that would flow from that knowledge. *Simpler v. State*, 318 Md. 311, 318–319, 568 A.2d 22 (1990); *Derricott v. State*, 84 Md.App. 192, 219–221, 578 A.2d 791 (1990), *rev'd on other grounds*, 327 Md. 582, 611 A.2d 592 (1992); *Aguilar v. State*, 88 Md.App. 276, 283, 594 A.2d 1167 (1991). Officer Matthews did not know that. We will also eschew reliance on the knowledge available to the more extended police team that the recent arrest of the appellee was for the carrying of a deadly weapon. Officer Matthews did not know that. What an officer does not know cannot be the basis for any suspicion on his part. We will, therefore, confine ourselves scrupulously to what was known or reasonably believed by the frisking officer.

■ Ironically, the crime for which the appellee was legitimately stopped was one that ordinarily would entitle the stopping officer to a frisk automatically. The appellee was stopped so that Officer Stephens might ascertain the status of the arrest warrant for him that had issued on January 5. Apparently none of the officers knew what those charges were. The warrant, of course, charged the appellee, *inter alia*, with carrying a deadly weapon. Had Officer Matthews but known that, the justification for the frisk would have been automatic. 3 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.4(a), at 505–506 (1987), quoted with approval in *Simpler v. State*, 318 Md. at 318–319, 568 A.2d 22; *Derricott v. State*, 84 Md.App. at 221, 578 A.2d 791.

C. How Much Is Reasonable or Articulable Suspicion?

As we undertake our analysis of whether Officer Matthews had reasonable suspicion to frisk the appellee, it is

important to set out what the reasonable suspicion standard entails. In legitimating for the first time at the constitutional level a frisk of a suspect for weapons on the basis of reasonable suspicion, *Terry v. Ohio, supra,* explained:

"It does not follow that because an officer may lawfully arrest a person only when he is apprised of facts sufficient to warrant a belief that the person has committed or is committing a crime, the officer is equally unjustified, absent that kind of evidence, in making any intrusions short of an arrest. Moreover, *a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody* for the purpose of prosecuting him for a crime. Petitioner's reliance on cases which have worked out standards of reasonableness with regard to 'seizures' constituting arrests and searches incident thereto is thus misplaced." (emphasis supplied).

*Terry,* 392 U.S. at 26–27, 88 S.Ct. at 1882–1883. The Supreme Court further explicated the standard:

"Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, *where he has reason to believe* that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." (emphasis supplied).

*Id.* at 27, 88 S.Ct. at 1883.

*Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309 (1990), was helpful in explaining that establishing reasonable suspicion is a significantly less onerous burden than establishing probable cause:

"*Reasonable suspicion is a less demanding standard* than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that *reasonable suspicion can arise from information that is*

*less reliable* than that required to show probable cause."
(emphasis supplied).

We ourselves discussed this measuring rod in *Gibbs v.
State,* 18 Md.App. 230, 237, 306 A.2d 587, *cert. denied,* 269
Md. 759 (1973):

> "[B]ecause the 'stop' is more limited in scope than an
> arrest and because the 'frisk' is more limited in scope
> than the full-blown search, *such actions,* though not to be
> undertaken arbitrarily, *may be reasonable* within the
> contemplation of the Fourth Amendment *upon a predi-
> cate less substantial than 'probable cause.'* *Terry* made
> it clear that 'stop and frisk' rationale was to be judged
> not by the Warrant Clause of the Fourth Amendment, but
> rather by the Reasonableness Clause. [The Supreme
> Court] said, at 392 U.S. 20, 88 S.Ct. at 1879:

>> 'If this case involved police conduct subject to the
>> Warrant Clause of the Fourth Amendment, we would
>> have to ascertain whether "probable cause" existed
>> to justify the search and seizure which took place.
>> However, that is not the case.... [W]e deal here
>> with an entire rubric of police conduct—necessarily
>> swift action predicated upon the on-the-spot observa-
>> tions of the officer on the beat—which historically
>> has not been, and as a practical matter could not be,
>> subjected to the warrant procedure. Instead, the
>> conduct involved in this case must be tested by the
>> Fourth Amendment's general proscription against
>> unreasonable searches and seizures.'

> The quantitative measure of reasonableness is various-
> ly labeled—'suspicion,' 'reasonable suspicion,' 'reason to
> believe.' " (emphasis supplied).

D. The Social Imperative of Officer Safety:

▉ In balancing the governmental interest furthered by
a frisk against the intrusion upon the citizen engendered by
that frisk, the Supreme Court has placed a high premium on
officer safety. That is the indispensable guide for making

the close calls. *Terry v. Ohio, supra,* set out graphically the social imperative justifying the frisking of suspects:

> "We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. *Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.* Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
>
> In view of these facts, *we cannot blind ourselves to the need for law enforcement officers to protect themselves* and other prospective victims of violence in situations where they may lack probable cause for an arrest. *When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."* (footnote omitted) (emphasis supplied).

*Terry,* 392 U.S. at 23–24, 88 S.Ct. at 1881, 20 L.Ed.2d at 907–908. *See also Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480–3481, 77 L.Ed.2d 1201, 1219–1220 (1983) ("Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger.")

In dealing with the somewhat related question of the propriety of requiring passengers to alight from an automobile that had been stopped for nothing more than a minor

traffic violation, *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 336 (1977), emphasized again the social imperative of officer safety:

"We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty. 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.'"

In balancing the interests that are involved when a close call must be made by the officer on the street, we cannot forget that an error on one side of the line may result in an inconvenienced and offended citizen, a circumstance not to be lightly dismissed. An error on the other side of the line, however, may result in a dead policeman.

E. The Frisk in this Case Was Reasonable:

We hold that Officer Matthews had a reasonable suspicion that the appellee might be armed. The frisk, therefore, was constitutional. The entire scene at 6220 Feroie Way was fraught with danger. The officers went there to arrest Ulysses Thompson for burglary—a crime that the Maryland Legislature has deemed to be "violent." Thompson physically resisted their efforts to place handcuffs upon him. Members of Thompson's family also impeded the officers in their effort to effectuate the arrest. Officer Matthews himself described the scene as "very chaotic."

The appellee could very plausibly have been a criminal associate of Thompson, for he had no need to knock or ring a bell before entering Thompson's house. He walked in unannounced. He hovered close enough to where Officer Matthews was attempting to subdue Thompson that the officer had to order him back. In terms of frisking a companion of an arrestee at an arrest scene, the observations of the United States Court of Appeals for the Ninth Circuit in *United States v. Berryhill*, 445 F.2d 1189 (9th Cir.1971), are pertinent:

"We think that *Terry* recognizes and common sense dictates that the legality of such a limited intrusion into a citizen's personal privacy extends to a criminal's companions at the time of arrest. It is inconceivable that a peace officer effecting a lawful arrest of an occupant of a vehicle must expose himself to a shot in the back from defendant's associate because he cannot, on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance. All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed."

*Berryhill* at 1193.

As soon as the appellee entered, Officer Gutberlet alerted Officer Matthews that the appellee had been arrested within the last year for attempted homicide. She informed him that the appellee had been the actual gunman. The appellee was wearing a jacket, moreover, that could easily have concealed a gun. Officer Matthews testified that he believed the appellee might be dangerous and that he was concerned for his own safety and that of Officer Gutberlet. He could not, however, turn his attention to the appellee until he had succeeded in subduing Thompson.

As soon as he had done that, however, he turned his attention immediately to the appellee, who was then standing with Officer Stephens. The first thing Officer Matthews heard from Officer Stephens was that Stephens "thought he had a warrant for him." Although Officer Matthews did not know what that warrant was for, he knew that the appellee had been arrested in 1991 for attempted homicide and that that attempt had been perpetrated with a gun.

In evaluating the significance to Officer Matthews of the appellee's possible involvement in a shooting and attempted homicide within the preceding year, we take note of 3

LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 9.4(a) at 117–118 (1978):

"Illustrative of the circumstances which the courts have deemed sufficient are: ... awareness that the suspect had previously been engaged in serious criminal conduct; awareness that the suspect had previously been armed."

*See also People v. Allen,* 50 Cal.App.3d 896, 123 Cal.Rptr. 80 (2d Dist.1975); *State v. Giltner,* 56 Haw. 374, 537 P.2d 14 (1975); *Collett v. State,* 167 Ind.App. 185, 338 N.E.2d 286 (1975).

The suppression hearing judge placed great reliance on the fact that Officer Stephens, as he was interacting with the appellee, did not fear for his own safety and felt no necessity to frisk the appellee. Officer Stephens's lack of suspicion, however, was immaterial. It was Officer Matthews who felt the need to frisk and who attempted to frisk, and it is Officer Matthews's conclusion in that regard, therefore, that must be assessed in terms of its reasonableness. Just as we may not supplement Officer Matthews's articulable suspicion by adding to it Officer Stephens's knowledge of the appellee "as being a drug dealer" because Officer Matthews was not aware of that, neither may we use Officer Stephens's lack of apprehension to diminish the apprehension of Officer Matthews. Unless communicated to him, what was in Officer Stephens's head may neither add to nor subtract from what was in Officer Matthews's head.

Under all of the circumstances, it cannot be said that Officer Matthew's fear for his safety and that of others was unreasonable. A pat-down of the exterior of the clothing surface of the appellee, who was being legitimately detained, was a reasonable measure to alleviate any possible danger. The frisk being reasonable, the appellee was not privileged to resist it by shoving the officer. That shove, albeit arguably minimal, was a battery. That was all that was required to justify the arrest of the appellee and the search incident thereto.

### F. There is No Privilege to Resist Even an Unlawful Frisk:

 Our holding that the appellee was not privileged to use force against Officer Matthews and that his arrest for assault and battery was, therefore, lawful rests upon an alternative and independent rationale. Even if the frisk would have been unlawful (we have held otherwise), there was no right or privilege on the part of the appellee to resist it by using force against the officer.

In *Barnhard v. State*, 86 Md.App. 518, 587 A.2d 561 (1991), *aff'd*, 325 Md. 602, 602 A.2d 701 (1992), Judge Rosalyn Bell undertook an extensive review of the modern trend away from recognizing a right in a private citizen to resist police action. She relied heavily on the Court of Appeals decision in *Rodgers v. State*, 280 Md. 406, 373 A.2d 944 (1977), *cert. denied*, 434 U.S. 928, 98 S.Ct. 412, 54 L.Ed.2d 287 (1978), which refused to extend the common law right of a citizen to resist an unlawful arrest to the case where an unlawful arrest had been made upon a warrant, albeit a facially defective warrant. From the reasoning in *Rodgers* and the extensive modern authorities quoted with approval in *Rodgers*, Judge Bell concluded that there is no right in a private citizen to resist a *Terry*-type stop even in a situation where that stop may have been unlawful:

> "Much of the underlying rationale in *Rodgers* for restricting the right to resist arrest is applicable here. If it were not, police officers would be subject to attack in every instance when, during the course of their investigation, they temporarily detain someone. To recognize the right to resist such momentary seizures, short of an arrest, serves only to expand the danger of violence. In keeping with the rationale set out in *Rodgers*, we conclude that *there is no right to resist an 'illegal' stop.*" (emphasis supplied).

*Barnhard*, 86 Md.App. at 527–528, 587 A.2d 561.

We do not hesitate to hold that the reasoning of *Barnhard v. State* with respect to an illegal stop would apply with equal validity to the case of an illegal frisk. Close

questions as to whether an officer possesses articulable suspicion must be resolved in the courtroom and not fought out on the streets. Albeit uttered in the different context of not permitting a "claim of right" to be asserted as a defense to robbery, the words of Judge Rodowsky in *Jupiter v. State*, 328 Md. 635, 616 A.2d 412 (1992), well express our disdain for permitting self-help by way of force and violence, "There are strong public policy reasons why self-help, involving the use of force against a person, should not be condoned."

*Rodgers v. State*, exhaustively analyzed and enlisted Maryland in the modern trend away from violent self-help. The Court acknowledged that *Sugarman v. State*, 173 Md. 52, 57, 195 A. 324 (1937), and progeny had recognized as applicable in Maryland the common law position that a citizen is permitted to use reasonably necessary force to resist an unlawful arrest. *Rodgers*, 280 Md. at 410, 373 A.2d 944. *See also Williams v. State*, 204 Md. 55, 102 A.2d 714 (1954); *Kellum v. State*, 223 Md. 80, 162 A.2d 473 (1960); and *Childress v. State*, 227 Md. 41, 175 A.2d 18 (1961). The Court of Appeals in *Rodgers* did not reaffirm those decisions. It was content to distinguish them, pointing out that there was no need to reexamine them in order to reach a decision in the case then before it:

> "We affirm the judgment of the Court of Special Appeals. We agree with that Court that our holding in *Sugarman v. State, supra*, and our other decisions adhering thereto—*which we have no occasion to reexamine today*—have no application to a situation where an arrest is made by a peace officer on a warrant duly issued by a judicial officer." (emphasis supplied).

*Rodgers*, 280 Md. at 421, 373 A.2d 944.

In *Rodgers*, the defendant resisted an arrest "made upon a warrant that was defective on its face." *Id.* at 407, 373 A.2d 944. The arrest was for a nonexistent crime. There was no question as to illegality. "Therefore, as the warrant was defective, the arrest was illegal as a matter of law." *Id.*

At his trial for resisting arrest, Rodgers filed a motion for judgment of acquittal, alleging that since his arrest was unlawful, he was thereby entitled to use reasonable force to resist it. In the Circuit Court for Baltimore City, Judge Robert Karwacki (now of the Court of Appeals) roundly rejected the defense argument:

> "It's a question of where you challenge it. What I am saying, when a citizen who is approached by a uniformed police officer who makes his identity known to the Defendant under arrest and pursuant to the command of a judicial officer, that citizen must submit to the arrest and has no power or no right to resist that arrest pursuant to a warrant properly issued by a judicial officer. *To rule otherwise,* I think, *would be to invite chaos."* (emphasis supplied).

*Rodgers,* 280 Md. at 409, 373 A.2d 944.

The Court of Appeals noted the general trend away from condoning force to resist an unlawful arrest. It pointed out that some states have reacted "by totally repealing the common law rule permitting resistance to illegal arrests and ordaining that a citizen submit to any arrest by a known police officer and then pursue his grievance in the courts." *Rodgers,* 280 Md. at 415, 373 A.2d 944. The Court in *Rodgers* cited the following case law that impliedly repealed the rule: *Miller v. Alaska,* 462 P.2d 421 (1969); *Idaho v. Richardson,* 95 Idaho 446, 511 P.2d 263 (1973); *City of Columbus v. Fraley,* 41 Ohio St.2d 173, 324 N.E.2d 735 (1975); *Daniel v. Florida,* 132 So.2d 312 (1961). *Rodgers,* 280 Md. at 415, 373 A.2d 944. The Court further pointed out that the "right to resist any arrest by a peace officer has been abolished by statute" in California, Delaware, Illinois, New Hampshire, New York, and Rhode Island. *Id.*

*Rodgers* then pointed to numerous precedents where those jurisdictions that have not yet abolished the common law right to resist an unlawful warrantless arrest have nonetheless refused to extend that right of resistance to the situation where the unlawful arrest is on the basis of a

facially invalid warrant. That was how the Court of Appeals ruled in the *Rodgers* case itself.

In analyzing the reasons for this tidal movement away from the earlier common law rule, the Court in *Rodgers* quoted with approval from a 1958 address to the American Law Institute by Judge Learned Hand:

> " 'The idea that you may resist peaceful arrest ... because you are in debate about whether it is lawful or not, instead of going to the authorities which can determine, ... [is] not a blow for liberty but on the contrary, a blow for attempted anarchy.' 1958 Proceedings, American Law Institute, at 254."

*Rodgers*, 280 Md. at 418, 373 A.2d 944. The Court of Appeals pointed out that "Judge Hand's comment was intended to apply to any arrest made by a peace officer, ..." *Id.*

The Court of Appeals explained that the dangers in permitting a citizen to resort to self-help include possible harm to the officer, possible harm to the citizen utilizing self-help, and possible harm to innocent bystanders:

> "Our concerns about the right to use force to resist an illegal arrest made upon a defective warrant arise in large measure, as we have noted, from the right of police officers to be free from attacks upon their person. But our concerns are not limited to the safety of police officers and extend in equal measure to the well-being of our citizens, including those subjected to an illegal arrest of this kind, for a dispute between an unarmed citizen and an armed police officer will most frequently result in injury to the citizen—at least in disproportion to the injuries received by his armed opponent. And even where the citizen may possess and attempt to use a deadly weapon, the probabilities are that he will suffer the greater damage to his person because of the superior skills of his police opponent. Nor can we ignore the fact that *combat on the streets between police officers and a*

*citizen resisting arrest can and often does involve pass-
ersby or other citizens, some of whom may be inclined
to enter the fray, to their detriment—others of whom
may suffer injury merely by being in the way."* (em-
phasis supplied).

*Id.* at 419–420, 373 A.2d 944. The general condemnation of
the very idea of "combat on the streets between police
officers and a citizen" is not affected, one way or another,
by the officers' status as one executing an arrest warrant,
one making a stop, or one conducting a frisk.

The *Rodgers* Court quoted with approval from the deci-
sion of the Supreme Court of California in *People v. Curtis*,
70 Cal.2d 347, 74 Cal.Rptr. 713, 450 P.2d 33, 36 (1969):

"While defendant's rights are no doubt violated when
he is arrested and detained a matter of days or hours
without probable cause, we conclude the state in remov-
ing the right to resist does not contribute to or effectuate
this deprivation of liberty. In a day when police are
armed with lethal and chemical weapons, and possess
scientific communication and detection devices readily
available for use, it has become highly unlikely that a
suspect, using *reasonable* force, can escape from or
effectively deter an arrest, whether lawful or unlawful.
*His accomplishment is generally limited to temporary
evasion, merely rendering the officer's task more diffi-
cult or prolonged. Thus self-help as a practical remedy
is anachronistic, whatever may have been its original
justification or efficacy in an era when the common
law doctrine permitting resistance evolved....* Indeed,
self-help not infrequently causes far graver consequences
for both the officer and the suspect than does the unlaw-
ful arrest itself. Accordingly, *the state, in deleting the
right to resist,* has not actually altered or diminished the
remedies available against the illegality of an arrest
without probable cause; it *has merely required a person
to submit peacefully to the inevitable and to pursue his*

*available remedies through the orderly judicial process."* (emphasis in original) (emphasis supplied).

*Rodgers,* 280 Md. at 420–421, 373 A.2d 944.

In weighing the virtue of pursuing redress through "the orderly judicial process" versus the vice of pursuing violent self-help on the street, the Court of Appeals unequivocally came down on the side of "discouraging violence":

"We are not unmindful that under present conditions the available remedies for unlawful arrest—release, followed by civil or criminal action against the offender—often may be inadequate. *This circumstance,* however, *does not elevate physical resistance to anything other than the least effective and least desirable of all possible remedies;* as such, its rejection, particularly when balanced against the State's interest in discouraging violence, cannot be realistically considered a deprivation of liberty." (emphasis supplied).

*Id.* at 421, 373 A.2d 944.

The appellee here, of course, had no idea what Officer Matthews knew or what Officer Matthews did not know. For him to attempt "to justify his use of force" upon mere speculation would be to urge upon us a result as ridiculous as that rejected by *Rodgers v. State,* 280 Md. at 421, 373 A.2d 944:

"[T]o do other than uphold the Appellant's conviction in this case would be to reach a ridiculous result, as he is attempting to justify his use of force in resisting this arrest by pointing out a defect in a warrant that neither he nor the arresting officers saw until after the arrest had taken place."

JUDGMENT REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEE.